Lynn A. SCHEIB, Benjamin Grosse, a minor, by Lynn Ann Scheib, his next friend and Carl Scheib, Plaintiffs–Appellants,

v.

Joan C. GRANT, Burton F. Grant, and Dorothy B. Johnson, Defendants–Appellees.

No. 93–1880.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 1, 1993.

Decided April 15, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied June 2, 1994.

Arthur T. Susman, Susman, Saunders &. Buehler, Aaron S. Wolff (argued) Chicago, IL, for plaintiffs-appellants.

George B. Collins (argued) Gregory A. Bedell, Collins & Bargione, Chicago, IL, for Joan C. Grant, Burton F. Grant.

Dorothy B. Johnson (argued), pro se.

Janice I. Wahnon, Johnson & Associates, Chicago, IL, for Dorothy B. Johnson.

Dennis A. Rendleman, Tom Leahy, Mary T. McDermott, Illinois State Bar Ass'n, Staff Counsel, Springfield, IL, for Illinois State Bar Ass'n amicus curiae.

Barry A. Miller, Malcolm C. Rich, Chicago Council of Lawyers, Chicago, IL, for The Chicago Council of Lawyers amicus curiae.

Before WOOD, Jr., EASTERBROOK and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

The plaintiffs, Lynn Scheib, her husband Carl Scheib, and her son Benjamin Grosse, brought this action pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"), 18 U.S.C. §§ 2510–2521, and the Illinois Eavesdropping Statute, 720 ILCS 5/14–1 *et seq.* Defendants Joan and Burton Grant had served as the attorneys of Lynn Scheib's former husband and Benjamin Grosse's father, James Grosse, during custody proceedings in Illinois state court. Defendant Dorothy Johnson had served as Benjamin Grosse's guardian ad litem ("GAL"). The district court granted summary judgment for the defendants. For the reasons that follow, we affirm.

## I

## BACKGROUND

### A. *Facts*

Lynn Scheib and James Grosse were divorced in 1982. Lynn had been granted sole custody of their son, Benjamin Grosse. Mr. Grosse had visitation privileges. In January 1991, Lynn informed James that she intended to marry Carl Scheib and move to Pennsylvania, and that she planned to take eleven-year-old Benjamin with her. As a result, James contacted his attorneys, Joan and Burton Grant, who filed an emergency motion for injunctive relief in Illinois state court to prohibit Benjamin's removal without a proper proceeding. Following litigation and negotiation, the parties, including the court-appointed GAL, Dorothy Johnson, reached a written settlement. The parties agreed that Benjamin could move with Lynn to Pennsylvania, but that James would have extended summer and holiday visitation rights. Although all parties signed the settlement on June 19, 1991, it was subject to court approval. While awaiting that approval, Lynn moved to Pennsylvania, and Benjamin stayed

with James in Illinois, where Benjamin was to stay as part of James' visitation rights until August 5, 1991.

While staying in Illinois with his father, Benjamin made telephone calls to, and received telephone calls from, his mother Lynn. According to James, on more than one occasion, Benjamin became upset and emotional after speaking with his mother. As a result, James decided to find out what was being said between Lynn and Benjamin in these calls. Unbeknownst to either Benjamin or Lynn, James used a telephone answering machine attached to an extension to record at least two conversations between Benjamin and Lynn. Because, as James tells it, the tapes of those conversations revealed that Lynn was causing emotional harm to Benjamin, he took them to his attorneys, Joan and Burton Grant. According to Joan Grant, she agreed with James that the tapes showed that harm was being done to Benjamin, and therefore informed the GAL of the tapes' contents.

After learning of the existence and content of the tapes from James' attorneys, Lynn's attorneys filed a motion in limine on July 24, 1991 to prevent James or the GAL from introducing the tapes at the hearing on the removal settlement. On August 2, 1991, the state court granted Lynn's motion in limine, apparently because the tapes were made in violation of the Illinois Eavesdropping Statute. The court's ruling was never issued as a written order because, after the court's oral ruling, the parties and the court agreed that the court would enter the removal settlement as an agreed order. Such an order was issued on August 5, 1991. Before the state court entered the settlement order, however, it asked Lynn whether she planned to bring a lawsuit against James in connection with the tapes. She stated that she would not bring such a lawsuit against James and, indeed, she did not do so. Instead, she filed this action against James' attorneys, Joan and Burton Grant, and against Benjamin's GAL, Dorothy Johnson. The complaint alleged violations of Title III, 18 U.S.C. §§ 2510–2521, and the Illinois Eavesdropping Statute, 720 ILCS 5/14–1 *et seq.*

### B. *District Court Proceedings*

In resolving Joan and Burton Grant's motion for summary judgment, the district court first addressed Title III, the federal wiretapping statute. The court stated that, if the facts at issue had presented a scenario of so-called "interspousal" wiretapping, i.e., if the facts showed James to have recorded the conversations to obtain information about Lynn, the plaintiffs' federal wiretapping cause of action would have had merit under the caselaw of a majority of the courts of appeals. *See, e.g., Heggy v. Heggy*, 944 F.2d 1537, 1538–41 (10th Cir.1991) ("We hold that Title III does apply to interspousal wiretapping within the marital home."), *cert. denied*, —— U.S. ——, 112 S.Ct. 1514, 117 L.Ed.2d 651 (1992). However, the district court stated that the "undisputed facts" in this case demonstrated that the tapes James made of telephone conversations between Benjamin and Lynn presented the court "with a parent who recorded the conversations of a minor child while that child resided in the parent's home." *Scheib v. Grant*, 814 F.Supp. 736, 739 (N.D.Ill.1993). The only question before the district court, then, was whether Title III should apply to such a situation.

Relying upon Second and Tenth Circuit cases, the district court stated that the statute's exemption for phone extensions used by a "subscriber or user in the ordinary course of its business" applies to the home as well as the marketplace. *See* 18 U.S.C. § 2510(5)(a)(i); *Newcomb v. Ingle*, 944 F.2d 1534 (10th Cir.1991) (holding that "a custodial parent tapping a minor child's conversations within the family home" is "permitted by a broad reading of the exemption contained in § 2510(5)(a)(i)"), *cert. denied*, —— U.S. ——, 112 S.Ct. 903, 116 L.Ed.2d 804 (1992); *Anonymous v. Anonymous*, 558 F.2d 677, 679 (2d Cir.1977) (same). Thus, the district court held that James' recording of Benjamin's conversations was exempted from Title III. As a result, no unlawful use or disclosure violation could be established against Joan and Burton Grant or Dorothy Johnson.

The district court then turned to the plaintiffs' claim that the defendants had violated

the Illinois Eavesdropping Statute, 720 ILCS 5/14–1 *et seq.*[1] Assuming *arguendo* that the defendants had violated the statute, the district court held that, because the defendants' disclosure of the tapes' contents was "intimately associated" with the state court proceedings, the defendants were entitled to absolute immunity under Illinois law. *Scheib*, 814 F.Supp. at 740. The need for advocates to press vigorously their clients' cases in court without fear of a lawsuit, the district court stated, was too great not to grant absolute immunity for judicially-related disclosures. The district court therefore granted Joan and Burton Grant's motion for summary judgment, and sua sponte granted summary judgment in favor of the GAL, Dorothy Johnson.

## II

## DISCUSSION

On appeal, the plaintiffs submit two issues for review. First, the plaintiffs assert that Title III admits of no exceptions applicable to this case. Therefore, they contend, James' activity violated the statute, regardless of whether that activity was motivated by a concern for Benjamin's welfare or by a desire to obtain unfavorable information about his former wife Lynn. The plaintiffs argue in the alternative that, even if there is an exception in the statute for attending to a child's welfare, an issue of triable fact exists in this case concerning the impetus behind James' taping. Second, the plaintiffs contend that the district court erred in concluding that the defendants were entitled to absolute immunity in this case and thus could not be held liable under the Illinois statute. We now review the district court's decision de novo to determine whether any genuine issue of material fact exists and whether the defendants were entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In so doing, we must take all facts in the light most favorable to the plaintiffs. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

### A. *Title III*

Section 2511 of Title III states in part that, except as provided elsewhere in the chapter, any person who:

(c) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection; or

(d) intentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection; shall be punished as provided in subsection (4) or shall be subject to suit as provide in subsection (5).

18 U.S.C. § 2511(1)(c) & (d). Title III provides a private cause of action in 18 U.S.C. § 2520, which provides in part:

Except as provided in section 2511(2)(a)(ii), any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter may in a civil action recover from the person or entity which engaged in that violation such relief as may be appropriate.

In short, using or disclosing information one has reason to know was obtained originally in violation of Title III is actionable under the statute. Title III, however, contains an extension phone exemption, which is set out in 18 U.S.C. § 2510:

(5) "electronic, mechanical, or other device" means any device or apparatus which can be used to intercept a wire, oral or electronic communication other than—(a) any telephone or telegraph instrument, equipment or facility, or any component thereof, (i) furnished to the subscriber or user by a provider of wire or electronic communication service in the ordinary

---

**1.** The district court possessed federal jurisdiction over the Illinois state law claim even after disposing of the federal Title III claim because diversity jurisdiction existed pursuant to 28 U.S.C. § 1332(a)(1). *See Scheib*, 814 F.Supp. at 740 n. 2.

course of its business and being used by the subscriber or user in the ordinary course of its business....

The issue in this case is not whether the defendants' activities fall under 18 U.S.C. § 2511(1)(c) & (d), but rather whether James' conduct in taping the conversations between Benjamin and Lynn was exempted from Title III by virtue of the extension phone exemption of 18 U.S.C. § 2510(5)(a)(i).

The plaintiffs submit that § 2510(5)(a)(i)'s extension phone exemption is not applicable to James' conduct. They assert that it makes no difference whether the taping is characterized as directed at Lynn or as motivated by Benjamin's welfare. The exception contained in § 2510(5)(a)(i) is simply inapplicable. First, if the taping is considered as directed at Lynn, the plaintiffs state that a majority of the circuits that have addressed the issue have held that there exists no "interspousal" exemption from the strictures of Title III.[2] The plaintiffs reason that no exemption can therefore be found in a case like this one which involves ex-spouses. The defendants concede that the statute does not contain any sort of "interspousal immunity." Therefore, the question of any kind of "interspousal" exemption is not at issue. *See* Appellees' (Grants') Br. at 11 (conceding that "[s]pying on your spouse to gain dirt for a divorce case is never within the ordinary course of a spouse's business").

Second, with respect to taping directed at Benjamin out of concern for his welfare, the plaintiffs state that the same reasoning supporting the absence of an "interspousal" exemption ought to control cases in which a party tapes the telephone conversations of any other person within the home, even a child not of majority age. In support of this contention, the plaintiffs submit that the language in the § 2510(5)(a)(i) exemption (which states Title III does not extend to instruments "a subscriber or user" employs "in the ordinary course of its business") does not apply outside the confines of strictly commercial activity. "Business," the plaintiffs submit, "means business." Further, the plaintiffs maintain that the cases which have construed the exemption in § 2510(5)(a)(i) to apply to situations in which a parent has recorded phone conversations of his or her child are distinguishable. In this regard, they point out that in both *Newcomb v. Ingle*, 944 F.2d 1534 (10th Cir.1991), and *Anonymous v. Anonymous*, 558 F.2d 677 (2d Cir. 1977), the parent recording the minor's conversations had custody of the child, unlike James, with whom Benjamin was only visiting. In any event, the plaintiffs assert, both cases were wrongly decided.

We cannot accept the plaintiffs' argument. At the outset, we note that, although the defendant-parent in both *Newcomb* and *Anonymous* had custody of the child whose conversations the parent recorded, we do not read either case as making the precise nature of the parent's custodial status a factor, much less outcome-determinative, in the decision. Rather, both cases focus on the extension phone exemption of § 2510(5)(a)(i) and the need for parents with whom a minor child is living to obtain information concerning that child's welfare. In *Anonymous*, the defendant-father had tape-recorded telephone conversations between his daughter, who was living with him at the time, and his estranged wife. The Second Circuit affirmed the dismissal of the wife's Title III action because the father's activities fell within

---

2. *See Heggy v. Heggy*, 944 F.2d 1537, 1539 (10th Cir.1991) (holding that "Title III does apply to interspousal wiretapping within the marital home"), *cert. denied,* — U.S. ——, 112 S.Ct. 1514, 117 L.Ed.2d 651 (1992); *Kempf v. Kempf*, 868 F.2d 970, 973 (8th Cir.1989) (holding that "the conduct of a spouse in wiretapping the telephone communications of the other spouse within the marital home, falls within [Title III's] purview"); *Pritchard v. Pritchard*, 732 F.2d 372, 374 (4th Cir.1984) (stating that there is "no indication in the statutory language or in the legislative history that Congress intended to imply an exception to facts involving interspousal wiretap-

ping"); *United States v. Jones*, 542 F.2d 661, 673 (6th Cir.1976) (holding that "the plain language of [§ 2511] and the Act's legislative history compels interpretation of the statute to include interspousal wiretaps"). *But see Simpson v. Simpson*, 490 F.2d 803, 805 (5th Cir.) ("The naked language of Title III, by virtue of its inclusiveness, reaches this case. However, we are of the opinion that Congress did not intend such a far-reaching result, one extending into areas normally left to states, those of the marital home and domestic conflicts."), *cert. denied,* 419 U.S. 897, 95 S.Ct. 176, 42 L.Ed.2d 141 (1974).

§ 2510(5)(a)(i)'s exemption: "Such a use of an extension phone in appellee's own home would certainly be in the 'ordinary course of [the user's] business.'" *Id.* at 678–79; *see also Janecka v. Franklin,* 843 F.2d 110, 111 (2d Cir.1988) (per curiam) (affirming validity of *Anonymous* where defendant-father claimed he recorded mother-daughter phone conversations out of concern for daughter's welfare).

Similarly, in *Newcomb,* the Tenth Circuit affirmed summary judgment entered against a plaintiff-son who had brought a Title III action against his mother. She had recorded conversations between him and his father when he was living with his mother as a minor; the recordings had revealed that the son's father, the mother's ex-husband, had instructed the son to set fire to his mother's home. *Newcomb,* 944 F.2d at 1535. The court stated that the "interception of a family member's telephone conversations by use of an extension phone in the family house is arguably permitted by a broad reading of the exemption contained in 18 U.S.C. § 2510(5)(a)(i)." *Id.* at 1536. The court continued:

> There is no persuasive reason why Congress would exempt a business extension and not one in the home. The difference between listening on the extension and tapping the line within the home in the context here is not material. "[W]e think the (5)(a)(i) exemption is indicative of Congress's intention to abjure from deciding a very intimate question of familial relations,

that of the extent of privacy family members may expect within the home vis-a-vis each other."

*Id.* (citation omitted).[3]

In our view, the plaintiffs have presented no persuasive reason why we ought to depart from the reasoning of the other circuits. The language of § 2510(5)(a)(i) juxtaposes the terms "subscriber" and "user" with the phrase "in the ordinary course of its business." Although the latter phrase might be used to distinguish commercial life from personal life, in the context presented here, it must be read in conjunction with the terms "subscriber" and "user." These terms certainly do not have exclusively market-oriented connotations. Reading this extension phone exemption as a whole, then, it is no lexical stretch to read this language as applying to a "subscriber's" conduct—or "business"—in raising his or her children. Congress might have spelled out in more precise detail the contours of the extension phone exemption; but its failure to do so does not relieve us of the obligation to give the statute a reading consistent with the probable intent of the legislature. We cannot attribute to Congress the intent to subject parents to criminal and civil penalties for recording their minor child's phone conversations out of concern for the child's well-being. As Judge Anderson stated in *Newcomb,* there is simply no reason why Congress would grant such an exemption to commercial but not domestic subscribers. *Id.*[4]

**3.** We note that cases subsequent to *Newcomb* appear to create an ambiguity with respect to the contours of the rule in the Tenth Circuit. The source of that ambiguity is *Thompson v. Dulaney,* 970 F.2d 744 (10th Cir.1992). In *Thompson,* the court appeared to limit the principle announced in *Newcomb* on the basis of the plaintiff's identity: "We distinguish *Newcomb* as did *Heggy* by noting that in *Newcomb* it was a minor child living at home at the time of the wiretap who was complaining, whereas here, as in *Heggy,* it is the spouse who is complaining." *Id.* at 747 n. 4. It appears that the *Thompson* panel may have misread the earlier decision in *Heggy v. Heggy,* 944 F.2d 1537 (10th Cir.1991). *Heggy* concerned interspousal wiretapping and, in the course of its discussion, the court reiterated the *Newcomb* holding and then distinguished it by stating that "the type of situation addressed in this opinion is 'qualitatively different from a custodial parent tapping a minor child's conversa-

tions within the family home.'" *Id.* at 1538 n. 1 (quoting *Newcomb,* 944 F.2d at 1535–36). As far as we are able to ascertain, the Tenth Circuit has not overruled *Newcomb.* Because we believe that *Newcomb* is correctly decided and is in agreement with the decisions of the Second Circuit in *Anonymous* and *Janecka,* 843 F.2d at 111 (affirming dismissal of Title III claim brought by ex-spouse of defendant where defendant claimed concern for child motivated taping), we shall not presume that *Newcomb* is no longer the law of the Tenth Circuit.

**4.** We note that the Supreme Court has refused to read a requirement of economic or profit-seeking activity into a statute absent clear language to that effect. *See National Organization of Women v. Scheidler,* —— U.S. ——, ——, 114 S.Ct. 798, 806, 127 L.Ed.2d 99 (1994) (holding that the unambiguous language of the RICO statute does

In the alternative, the plaintiffs submit that, even if § 2510(5)(a)(i) covers a situation in which a parent tapes a child's phone conversations out of concern for the child's welfare, there exists in this case a genuine issue of material fact as to whether concern for Benjamin's welfare was in fact James' purpose in taping the phone conversations between Benjamin and Lynn. The plaintiffs submit that a jury ought to decide whether James recorded the telephone conversation because of a concern for Benjamin, or because of a desire to obtain negative information about his ex-wife Lynn. *Cf. Thompson v. Dulaney,* 838 F.Supp. 1535, 1545 (D.Utah 1993) (stating that "there is a fact question as to what [defendant-mother's] 'purpose' was in intercepting the conversations").

■ The burden of establishing a matter of intent is always difficult. We therefore approach the matter of summary judgment carefully in such cases. *See Bronze Shield, Inc. v. New Jersey Dep't of Civil Serv.,* 667 F.2d 1074, 1087 (3d Cir.1981) (stating that because intent is "difficult to establish, summary judgment should be granted with caution"), *cert. denied,* 458 U.S. 1122, 102 S.Ct. 3510, 73 L.Ed.2d 1384 (1982). Nonetheless, we have made clear that "[s]ummary judgment will not be defeated simply because issues of motive or intent are involved, and is proper when the plaintiff fails to indicate any motive or intent to support plaintiff's position." *Morgan v. Harris Trust & Sav. Bank,* 867 F.2d 1023, 1026 (7th Cir.1989). Here, the defendants have submitted evidence tending to show that James' concern for Benjamin was based on information that the child's conversations with his mother were the source of his becoming upset.[5] Under these circumstances, the plaintiffs had to do more to avoid summary judgment than to point out that Lynn was on the other line every time James recorded Benjamin's calls. Accordingly, we hold that James Grosse did not violate Title III in recording Benjamin's conversations with Lynn. As a result, no unlawful use or disclosure violation can be established against the defendants.[6]

## B. *Illinois Eavesdropping Statute*

■ The plaintiffs also alleged that the defendants violated the Illinois Eavesdropping Act, 720 ILCS 5/14-1 *et seq.* The statute states that a "person commits eavesdropping when he . . . [u]ses or divulges . . . any information which he knows or reasonably should know was obtained through the use of an eavesdropping device." 720 ILCS 5/14-2(b). The district court assumed *arguendo* that the defendants had violated the statute. Nonetheless, it held that, because the defendants' activities were "intimately associated" with ongoing judicial proceedings, the defendants were entitled to absolute immunity.

The plaintiffs submit that the district court erred in granting attorneys Joan and Burton Grant and GAL Dorothy Johnson absolute immunity, regardless of whether their conduct was intimately associated with the state court removal proceedings. At most, they state, the defendants were entitled to qualified immunity. The defendants, on the other hand, contend that the longstanding common

not require a racketeering enterprise or racketeering predicate acts to be accompanied by an economic motive).

5. The defendants submitted the affidavit of James Grosse. In it, he states that Benjamin became "extremely upset" and "experienced . . . traumatic episodes following conversations with Lynn. Each time, Benjamin would react negatively and become anti-social. . . . Never before had he cried so or refused to talk with me or the family. I became even more concerned when I realized Benjamin reacted this way only after he spoke with Lynn." R. 40, Exh. 1, ¶¶ 11–14. Benjamin himself states in an affidavit that he was "angry" and "upset" and cried after speaking with his mother on different occasions. R. 56, Exh. 2, ¶ 8. It is true that Benjamin also

states that, although he was emotional after speaking with his mother, it was not those conversations that were upsetting him. However, insofar as James Grosse's motivations are concerned, the appearance that Benjamin was troubled after speaking with his mother is what is important. There is no evidence in the record that Benjamin explained the underlying causes of his behavior to his father at the time of the events at issue.

6. In light of our holding, we need not address the defendants' arguments concerning whether James had authority to consent vicariously for Benjamin, and whether Title III applies to recordings of conversations which take place on cordless telephones.

law protection afforded to attorneys' statements and conduct closely associated with judicial proceedings required the district court to grant the defendants nothing less than absolute immunity. We conclude that the district court did not err in holding the defendants absolutely immune from damages liability under the Illinois Eavesdropping Statute for using or divulging the tape recorded conversations in a manner intimately associated with the state court removal proceeding.

With respect to James' attorneys, Joan and Burton Grant, we begin with "the oft-stated principle in Illinois that anything said or written in a legal proceeding ... is protected by an absolute privilege against defamation actions, subject only to the qualification that the words be relevant or pertinent to the matters in controversy." *Defend v. Lascelles,* 149 Ill.App.3d 630, 102 Ill.Dec. 819, 821, 500 N.E.2d 712, 714 (1986); *see also Libco Corp. v. Adams,* 100 Ill.App.3d 314, 55 Ill.Dec. 805, 806, 426 N.E.2d 1130, 1131 (1981) ("The absolute privilege protects anything said or written in a legal proceeding."). The public policy concern underlying the rule prohibiting defamation actions against attorneys arising out of statements or conduct with "some relation" to a judicial proceeding is straightforward: "[I]t is uniformly recognized that the judicial system would be best served if persons with knowledge of relevant facts could report those facts to the court without fear of civil liability." *Defend,* 102 Ill.Dec. at 821, 500 N.E.2d at 714. The attorney in such a situation " 'is acting in furtherance of some interest of social importance, which is entitled to protection even at the expense of uncompensated harm to the plaintiff's reputation.' " *Thomas v. Petrulis,* 125 Ill.App.3d 415, 80 Ill.Dec. 713, 715, 465 N.E.2d 1059, 1061 (1984) (citation omitted); *see also Defend,* 102 Ill.Dec. at 823, 500 N.E.2d at 716 (stating that the "significant interest" involved is the "facilitati[on] of the truth-seeking process"). This absolute privilege is afforded even when malice is assumed to have motivated the attorney. *Id.* at 823–24, 500 N.E.2d at 716–17.

We believe that, if the matter were presented to them today, the Justices of the Supreme Court of Illinois would conclude that the same policy concerns that animate the common law rule prohibiting defamation actions for statements made in relation to a judicial proceeding ought to apply to actions brought under the Illinois Eavesdropping Statute against attorneys who use or disclose information in a manner intimately associated with an ongoing judicial proceeding. We believe that the Illinois Court would conclude that the truth-seeking process of a judicial proceeding will be most securely advanced if attorneys do not fear civil or criminal liability as the consequence of misjudging the legality of disclosing particular information.

We cannot accept the plaintiffs' contention that giving attorneys such absolute immunity "would immunize an attorney's destruction of evidence or elimination or concealing of a material witness so long as the motivation was to help the client." Appellants' Br. at 46. So long as absolute immunity is extended only to the attorneys' statements or conduct closely related to ongoing judicial proceedings, courts will be able to police attorney behavior that civil actions will not be able to reach. As the district court stated, courts have sufficient tools, such as the suppression of evidence and disciplinary sanctions, to guard against abusive conduct that takes place in the confines of a judicial proceeding. *Cf. Auriemma v. Montgomery,* 860 F.2d 273, 278–79 (7th Cir.1988) (declining to extend absolute immunity to attorneys' extrajudicial investigation because such an investigation is not subject to judicial safeguards and protections), *cert. denied,* 492 U.S. 906, 109 S.Ct. 3215, 106 L.Ed.2d 565 (1989). In this regard, we note that "there is no 'professional responsibility tort' in Illinois." *Zanders v. Jones,* 680 F.Supp. 1236, 1239 (N.D.Ill.1988) (refusing to recognize cause of action against attorney for violation of Illinois Code of Professional Responsibility), *aff'd without op.,* 872 F.2d 424 (7th Cir. 1989). "The Illinois courts have refused ... attempts to extend tort liability for conduct in the course of a legal proceeding." *Id.* Because the record indicates that neither Joan nor Burton Grant made any extrajudi-

157

cial disclosure of the recorded conversations, but rather disclosed portions of the recordings only to persons intimately involved in the ongoing state court litigation, they were entitled to absolute immunity.[7]

With respect to Benjamin's GAL, Dorothy Johnson, we conclude that she too was entitled to absolute immunity. Although no Illinois case has addressed the issue of immunity with respect to a GAL's conduct in a judicial proceeding, state courts which have addressed the general issue of GAL immunity have granted GALs absolute immunity.[8] Those courts reasoned that, absent absolute immunity, the specter of litigation would hang over a GAL's head, thereby inhibiting a GAL in performing duties essential to the welfare of the child whom the GAL represents. We believe that the Illinois Supreme Court would find this reasoning persuasive and grant a court-appointed GAL absolute immunity from lawsuits arising out of statements or conduct intimately associated with the GAL's judicial duties. In this case, the record reflects that Dorothy Johnson, who was appointed by the court to serve as Benjamin's GAL, merely listened to portions of the tape after being informed by James' attorneys, the Grants, that the tapes concerned Benjamin's well-being, and later opposed the motion in limine to exclude the tapes from the removal proceeding. Conduct so closely related to a GAL's judicial duties cannot form the basis of a lawsuit if GALs are to continue to apprise courts of all relevant information concerning the GAL's ward.

Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED.

---

7. The district court stated in its opinion that "the Grants and Dorothy Johnson disclosed alleged portions of the tape recordings to each other, to other persons and to Judge Moshe Jacobius." *Scheib*, 814 F.Supp. at 738. We do not know to whom the district court was referring in stating that the defendants disclosed the content of the tapes to "other persons." The record is devoid of any evidence indicating that the defendants made disclosures to anyone but the court, opposing counsel, and each other, and the plaintiffs conceded as much at oral argument. We emphasize that there is absolutely no allegation in the case that the attorneys directed or even advised James Grosse to tape the conversations.

8. *See, e.g., Bird v. Weinstock,* 864 S.W.2d 376, 383 (Mo.App.1993) (granting court-appointed

GAL absolute immunity for actions undertaken in the judicial process); *Collins v. Tabet,* 111 N.M. 391, 806 P.2d 40, 44 (1991) (holding that "a [GAL], appointed in connection with court approval of a settlement involving a minor, is absolutely immune from liability for his or her actions taken pursuant to appointment"); *Penn v. McMonagle,* 60 Ohio App.3d 149, 573 N.E.2d 1234, 1237 (1990) (holding that GAL "is entitled to absolute immunity from actions arising out of the performance of her duties as [GAL]"); *Tindell v. Rogosheske,* 428 N.W.2d 386, 387 (Minn. 1988) (same); *see also Kurzawa v. Mueller,* 732 F.2d 1456, 1458 (6th Cir.1984) ("A failure to grant [absolute] immunity would hamper the duties of a [GAL] ... in judicial proceedings.").